**UNITED STATES of America**
**v.**
**John JEFFRIES, Willie R. Ross and Lawrence D. Stephenson.**
**Crim. No. 623–68.**

United States District Court
District of Columbia.
July 29, 1968.

Supplemental Opinion Aug. 7, 1968.

Opinion on Constitutionality of Riot Statute Aug. 13, 1968.

---

See also D.C., 45 F.R.D. 119.

James A. Strazzella, Lee Freeman, Asst. U. S. Attys., for the United States.

Robert L. Weinberg, Washington, D. C., for defendant Jeffries.

John Bray, Washington, D. C., for defendant Ross.

Belford V. Lawson, Jr., Washington, D. C., for defendant Stephenson.

## MEMORANDUM

GESELL, District Judge.

At the pretrial of this case on Monday, July 22, 1968, defendant Jeffries made two oral motions, which were adopted by counsel in other cases growing out of the April civil disturbances also being pretried that day. The Court, having taken the contentions of the parties under consideration, denied the motions for reasons set forth below.

The motions seek to have certain counts dismissed as insufficient for failure to conform to the requirements of Rule 7(c), F.R.Crim.P., that:

"The indictment * * * shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged."

First, as to the count charging second degree burglary, defendants allege that the indictment is defective in not alleging unlawful entry which, it is claimed, is an essential element of the offense. Count I reads:

"On or about April 5, 1968, within the District of Columbia, John Jeffries, Willie R. Ross and Lawrence D. Stephenson entered the store of Robert Dorsen, Inc., a body corporate, with intent to steal property of another."

Title 22, Section 1801(b) of the District of Columbia Code reads in pertinent part:

"* * * whoever shall * * * break and enter, or enter without breaking, any * * * store * * * or other building * * * with intent * * * to commit any criminal offense, shall be guilty of burglary in the second degree."

Clearly, the statute does not, on its face, require the allegation in the indictment that the entry was unlawful. Ordinarily, it is sufficient if the indictment follows the language of the statute creating the offense. 8 Moore, Federal Practice, § 7.04, pp. 7–15 (1968). The crucial element of the offense of second degree burglary is the specific intent which impelled the entry and not the lawful or unlawful manner of entry. To be sure, an unlawful entry bears heavily on the question of the defendant's intent but it is not a prerequisite to the establishment of such an intent. Naples v. United States, 120 U.S.App.D.C. 123, 344 F.2d 508, 514 (1964).

The standard housebreaking charge approved in this jurisdiction does not mention illegality of entry. No. 76, Criminal Jury Instructions, D.C.Bar Assoc., 1966. Furthermore, there is no evidence that when Congress amended D.C.Code § 22–1801 by means of Pub.L. 90–226, § 602, Title VI, 81 Stat. 736, December 27, 1967, it intended to make second degree burglary different, in this respect, from the previous crime of housebreaking. While there are several cases, prior to *Naples*, which talk of "unlawful entry" in connection with housebreaking, the Court believes that such language reflects the assumption that proof of intent normally rests upon proof of an unlawful entry. The Court does not believe that these cases read the word "unlawful" into D.C.Code § 22–1801(b) so as to render Count I insufficient to charge an offense. See: Lee v. United States, 37 App.D.C. 442, 445 (1911); Washington v. United States, 98 U.S.App.D.C. 100, 232 F.2d 357 (1956); Stewart v. United States, 116 U.S.App.D.C. 411, 324 F.2d 443 (1963);

United States v. Frank, 225 F.Supp. 573, 576 (D.D.C.1964).

Defendants have in no way shown that they have been prejudiced by the supposed failure to allege that the entry was unlawful, if in fact it was, and such failure can amount to no more than harmless error. Smith v. United States, 360 U.S. 1, 9, 79 S.Ct. 991, 3 L. Ed.2d 1041 (1959).

Second, defendants allege that Count II of the indictment, charging grand larceny, is defective because it does not allege that the defendant "took and carried away" the property in question but rather that he "stole" it, citing United States v. Handler, 142 F.2d 351 (2d Cir. 1944) for the proposition that the word "stealing" has no common law definition to restrict its meaning and that the count, therefore, failed to clearly state the essential elements of the offense of grand larceny.

The Court does not agree with this contention. Failure to allege the statutory elements is not fatal to an indictment provided that alternative language is used. 8 Moore, Federal Practice, § 7.04, pp. 7–15 (1968), citing Grant v. United States, 291 F.2d 746, 748 (9th Cir.1961), cert. denied, 368 U. S. 999, 82 S.Ct. 627, 7 L.Ed.2d 537 (1961); Finn v. United States, 256 F.2d 304, 306–307 (4th Cir.1958).

The word "steal" is defined in Black's Law Dictionary (4th ed.) as follows:

"This term is commonly used in indictments for larceny, ('take, *steal*, and carry away,') and denotes the commission of theft, that is, the felonious taking and carrying away of the personal property of another, and without right and without leave or consent of owner, People v. Surace, 295 Ill. 604, 129 N.E. 504, 506; State v. Banoch, 193 Iowa 851, 186 N.W. 436; Alvarado v. State, 38 Okl.Cr. 360, 261 P. 983, 985; and with intent to keep or make use wrongfully * * *."

The words "steal" or "stolen" are used in the standard charge for grand larceny (No. 73), in other charges in this jurisdiction (Nos. 75, 81, 114), and in numerous statutes (e. g., D.C.Code § 22–2205, Receiving Stolen Goods; 18 U. S.C. § 2312, Interstate Transportation of Stolen Motor Vehicle). The Court is satisfied that use of the word "stole" in Count II of the indictment in this case does not render the count insufficient to charge the offense of grand larceny.

The motions to dismiss Count I and the motion to dismiss Count II are hereby denied.

### SUPPLEMENTAL OPINION

Defendants move to dismiss the indictment on the ground the indictment was not found in accordance with the requirements of the Fifth Amendment to the Constitution and Rules 6 and 7 of the Federal Rules of Criminal Procedure.

It is asserted that the text of the indictment was never submitted to the grand jury for a vote. There is no dispute as to the facts. After hearing testimony presented against the defendants, the grand jury, in sufficient number, voted a "presentment." Thereafter an indictment was drafted by the United States Attorney. This indictment was then read by the foreman and signed by him and was also checked by the secretary of the grand jury. Thereafter the indictment was returned in open court with the members of the grand jury present. The text of the indictment was not submitted to the grand jury for a vote. It is not contended, nor is there any evidence to suggest that the text of the indictment varied from the evidence adduced before the grand jury prior to the vote on the "presentment."

Careful research by counsel and the Court has not disclosed any federal case discussing whether the vote of the grand jury must follow the drafting of the indictment and be taken only after a reading of the text, in contrast to the proce-

dure followed in this and some other jurisdictions where the vote of the grand jury is taken and a presentment made prior to the preparation of the indictment text.

There is no provision of the Federal Rules of Criminal Procedure that requires the vote to be taken either before or after drafting of the indictment. Rule 6(f) states that an indictment may be "found" upon the vote of 12 or more jurors, but there is nothing in the rule or its history which suggests that the word "found" requires that the indictment be physically in existence at the time. Nor does Rule 7 throw any light on the issue. Apparently the practice varies in different federal jurisdictions but this jurisdiction is in no way unique in following the procedures outlined above.

Defendants rely on Blackstone and the practice followed in England prior to the enactment of the Constitution. United States v. Cox, 342 F.2d 167 at 186–189 (5th Cir.1965), cert. denied Cox v. Hauberg, 381 U.S. 935, 85 S.Ct. 1767, 14 L. Ed.2d 700 (1965) and Costello v. United States, 350 U.S. 359 at 362, 76 S.Ct. 406, 100 L.Ed. 397 (1956) are cited but these cases do not deal with the precise issue before the Court. Defendants also urge that under the challenged procedure the prosecution may amend the indictment after the grand jury votes and recite facts different from the evidence on which the grand jury relied. This, of course, implies dishonorable conduct by the prosecution and there is nothing before the Court to suggest this type of intrusion on the proper functions of the grand jury.

This type of motion has previously been made to other judges of this Court in other cases and uniformly denied without opinion. The following quotation from Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906), would appear to endorse the practice followed in this jurisdiction:

"An accused person is usually charged with crime by a complaint made before a committing magistrate, which has fully performed its office when the party is committed or held to bail, *and it is quite unnecessary to the finding of the indictment by a grand jury*; or by an information of the district attorney, which is of no legal value in prosecutions for felony; or by a presentment usually made, as in this case, for an offense committed in the presence of the jury; or by an indictment which, as often as not, *is drawn after the grand jury has acted upon the testimony.* \* \* \*" 201 U.S. at 59, 26 S.Ct. at 372. (Emphasis added.)

There being no evidence of any prejudice to the defendant and no rule or decision requiring the procedure urged, it is apparent on the authority of dicta in Hale v. Henkel, supra, and the strength of long-established practice in this and other federal jurisdictions that the motion should be and it is hereby denied.

## OPINION ON CONSTITUTIONALITY OF RIOT STATUTE

The motion of defendant Jeffries, which has been adopted by defendants in this and a number of other cases, seeks to overturn the District of Columbia riot statute enacted December 1967, 22 D.C. Code § 1122, claiming that it offends the due process clause of the Fifth Amendment of the Constitution. Since many individuals have been indicted for violation of this statute in the District of Columbia, this issue requires prompt determination and the Court has given it priority consideration. The issues have been ably briefed and argued.

The statute under attack reads as follows:

"(a) A riot in the District of Columbia is a public disturbance involving an assemblage of five or more persons which by tumultuous and violent conduct or the threat thereof cre-

ates grave danger of damage or injury to property or persons.

"(b) Whoever willfully engages in a riot in the District of Columbia shall be punished by imprisonment for not more than one year or a fine of not more than $1,000, or both.

"(c) Whoever willfully incites or urges other persons to engage in a riot shall be punished by imprisonment for not more than one year or a fine of not more than $1,000, or both.

"(d) If in the course and as a result of a riot a person suffers serious bodily harm or there is property damage in excess of $5,000, every person who willfully incited or urged others to engage in the riot shall be punished by imprisonment for not more than ten years or a fine of not more than $10,000, or both. (Dec. 27, 1967, Pub. L. 90–226, Title IX, § 901, 81 Stat. 742)."

The indictment, which is in the standard form being used, charges Jeffries with engaging in riot in the following terms:

"On or about April 5, 1968, within the District of Columbia, John Jeffries, Willie R. Ross and Lawrence D. Stephenson did willfully engage in a riot, in that the said defendants John Jeffries, Willie R. Ross and Lawrence D. Stephenson did willfully engage in a public disturbance involving an assemblage of five or more persons which by tumultuous and violent conduct, and the threat thereof, did create a grave danger of damage and injury to property and persons." (Count Three).

It will be noted that the indictment, as in all the other indictments returned to date following the April disorders, charges willfully engaging in a riot (a misdemeanor), and not willfully inciting and urging others to engage in riot, which, in some instances, may be a felony.

 Defendant contends that the riot statute is unduly vague and so lacking in criteria as to leave the public and the courts uncertain as to the nature of the conduct prohibited. In support of this contention, defense counsel have attempted to pick the statute apart, word for word, pointing to the possible uncertainties found in such words as "engage," "tumultuous," "violent," "threat," and "grave danger." On the surface this is effective polemic but the concept of vagueness requires regard for the over-all thrust of the statute. Not only is the statute cast in terms of "riot" so that the words must be read in that context, but the text must be viewed as a whole and not by taking each word as though wholly unrelated to any other.

 The principal vagueness attack focuses on the word "engages." The word "engages" is, however, in conjunction with the definition of "riot" in the statute, quite precise. Cf. United States v. Kahriger, 345 U.S. 22, 34, 73 S.Ct. 510, 97 L.Ed. 754 (1953). Clearly, it has its accepted meaning, e. g., to take a part, to involve one's self or become involved or to join. Moreover, it is coupled with the express requirement of willfulness.

Significantly, the word "engage" is found in other District of Columbia criminal statutes, e. g., 22 D.C.Code § 1107 (Unlawful Assembly), and 22 D.C. Code § 2705 (Pandering), as well as in federal criminal statutes, e. g., 18 U.S.C. § 372 (Conspiracy to Impede or Injure Officer), and 18 U.S.C. § 1084 (Transmission of Wagering Information). The other words challenged in the statute have an accepted common law meaning. Carmichael v. Allen, 12 Race Relations Law Reporter 37, 46 (N.D.Ga.1966).

Few criminal statutes have the complete certainty that defendant urges is required of this riot statute. Certainly, this statute neither forbids nor requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and dif-

fer in any substantial degree as to its application. Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). When the statute is analyzed in the light of the foregoing discussion, it appears to be narrowly drawn and limited so as to define and punish specific conduct. Chaplinsky v. State of New Hampshire, 315 U.S. 568, 573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); Cantwell v. State of Connecticut, 310 U.S. 296, 311, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352 (1940).

■■■ The constitutional attack based on vagueness has placed emphasis upon the possible intrusion of the statute on First Amendment rights. It is suggested that the statute is so broad and indefinite that it invades areas of free speech and peaceful assembly. It is said that the riot law will have such a chilling effect that regardless of the conduct of the movant he is entitled and has standing to challenge the constitutionality of the statute as a whole, that is, "on its face." Hypothetical situations are conjured up to illustrate how the statute might be abused in its application so as to interfere with cherished First Amendment rights. No case even bordering on these hypotheticals is before the Court. And, unlike those precedents upon which defendant relies, the statute before the Court, as indicated below, is basically concerned with conduct rather than free expression. Not only is every defendant accused of violating this statute indicted for engaging under (b), rather than inciting or urging under (c), but in every case the defendant has been accused in other counts of the same indictment with burglary, e. g., looting, and often larceny as well. Almost invariably the pretrial or later proof discloses, as in this case, that the other criminal acts allegedly took place at the same time and at the same place where defendant is said to have engaged in riot.

Indeed, it is clear from the pretrial proceedings in these cases that defendants are being uniformly charged with engaging in riot by reason of conduct itself believed to be criminal. This is the very opposite of the situation described by the Supreme Court in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), which indicated that a statute involving First Amendment rights may be attacked under the vagueness doctrine where

"the conduct charged in the indictments is not within the reach of an acceptable limiting construction readily to be anticipated as the result of a single criminal prosecution and is not the sort or 'hardcore' conduct that would obviously be prohibited under any construction. * * *" 380 U.S. at 491–492, 85 S.Ct. at 1123.

See also, Carmichael v. Allen, 12 Race Relations Law Reporter, 37, at 46 (N.D. Ga.1966).

■■■ A riot statute such as this, moreover, can limit speech under certain circumstances. This is not a new problem. Years ago, Judge Learned Hand dealt with it in trenchant prose, which should not be forgotten. The distinguished jurist said:

"Words are not only the keys of persuasion, but the triggers of action, and those which have no purport but to counsel the violation of law cannot by any latitude of interpretation be a part of that public opinion which is the final source of government in a democratic state. * * *" Masses Pub. Co. v. Patten, 244 F. 535, 540 (S.D.N.Y.1917).

If there is a strong and immediate danger that words will cause grave danger to persons or property, they may be suppressed; the Constitution does not afford any protection. There must always be a balance struck between public safety and the search for truth. This is the teaching of Justice Holmes in Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919); his perceptive comments on shouting fire in a theatre

and causing panic are still in point to-day. In the District of Columbia riot statute speech is only regulated under (b) where it is so closely brigaded with illegal action as to be an inseparable part of it. See A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Com. of Massachusetts, 383 U.S. 413, 426, 86 S. Ct. 975, 16 L.Ed.2d 1 (1966), (J. Douglas concurring). There can be no valid constitutional objection to this.

This Court is well aware of the necessity of protecting any citizen from conviction under this statute if he was innocently swept up in conduct he did not instigate or support, particularly where speech short of clear-and-present danger concepts is involved. With this and other constitutional considerations well in mind, the judges of this Court presiding at trials charging defendants with engaging in riot have used the instruction attached to this opinion as Appendix A when submitting the offense to the jury. Defendant grudgingly appears to recognize that the offense of engaging in riot so defined may not be subject to legal attack. In any event, the Court is satisfied it meets the most exacting standards.

Defendant urges, however, that the grand jury did not have this charge or its equivalent interpretation before it and that there in effect has been a loose, unguided approach to indictments returned by the grand jury to date. Reliance is placed upon Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L. Ed.2d 240 (1962). Even assuming that this case is to be interpreted as defendant contends, there is no proof before the Court to support this argument. Indeed, the known facts are to the contrary. As already noted, no indictment has been returned charging engaging in riot alone. Always this count is coupled with counts charging Burglary II, e. g., looting, and grand or petty larceny. Thus it is clear that the grand jury considered "engage" in conjunction with

separate but immediately related criminal conduct, a far higher standard than the statute as interpreted requires. In the future it may reasonably be assumed that the United States Attorney will not go beyond limits set by the standard instruction accompanying this opinion when presenting future cases involving engaging in a riot.

It is not contended and indeed it could not have been contended that Congress acted outside its police powers in passing this statute for the District. See Cox v. State of Louisiana, 379 U.S. 559, 574, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). Comparable statutes exist in many jurisdictions. Cf. 39 New York Laws Ann.Penal Law, McKinney's Consol.Laws, c. 40, § 240.05; 38 Ill.Ann. Stat. § 25–1; 48 Calif.Penal Code Ann. § 404.6.

The Court is unable to consider this motion in a vacuum. This is not the proper occasion for what Dean Pound once called "Mechanical Jurisprudence." Legal principles developed in different contexts must be applied with regard for the conditions leading to the challenged enactment. The language used by Congress was carefully selected and designed to provide law enforcing officers here with power to cope with the modern type of looting riot that springs up without an advance concerted plan and is so spontaneously tumultuous and violent that property and persons are in grave danger under terrifying conditions beyond effective law enforcement control.

Here is a new statute carefully designed to meet a new urban problem of major proportions. It is not intended to suppress any cherished freedom or even directed at them. Rather, it is designed to help maintain some degree of order on the city streets by providing additional sanctions against looting, arson, and related civil disorder such as the city experienced last April. No prior decision is in precise point. Nothing much is gained by attempting to analogize this

statute to common law riot precedents on the one hand or to the confusing decisions dealing with vagueness in the context of statutes affecting free expression on the other. This statute is designed to deal with specific conduct and to prevent a clearly identifiable social evil. Fallible though the English language may be, and recognizing the possibility of abuse by over-zealous police or prosecutors, the fact is this statute is well within the police powers of Congress. Undoubtedly the courts will gradually give the language more precision and stamp down hard on any abuses. The statute, which has only slightly fuzzy edges, if any, should be allowed to stand. It will effectively serve its well-intended and necessary purpose.

The statute has been strictly construed and applied, constitutional rights have been carefully safeguarded and the challenge to the constitutionality cannot succeed on the facts or authorities before the Court. The motion is denied.

## APPENDIX A

The defendant is also charged in the indictment with the offense of engaging in a riot. The essential elements of this offense, each of which the Government must prove beyond a reasonable doubt, are:

(1) That there was a public disturbance within the District of Columbia which by tumultuous and violent conduct, or the threat thereof, created grave danger of damage or injury to property or persons;

(2) That there was an assemblage of five or more persons, including the defendant, engaged in the public disturbance; and

(3) That the defendant and at least four other members of the assemblage willfully engaged in the public disturbance.

*First,* what is a public disturbance involving tumultuous and violent conduct, or the threat thereof, which creates grave danger of damage or injury to property or persons? The conduct involved must be something more than mere loud noise making or minor breaches of the peace. The offense requires a condition that has aroused or is apt to arouse public alarm or public apprehension where it is occurring. It involves frightening group behavior.

Tumultuous and violent conduct will usually be accompanied by the use of actual force or violence against property or persons. At the very least it must be such conduct as has a clear and apparent tendency to cause force or violence to erupt and thus create a grave danger of damage or injury to property or persons. Damage or injury to property includes either actual physical damage to property or the taking of another's property without the consent of the owner.

The term "grave danger" means something more than the possibility of danger or a minor difficulty. The danger may be actually present or threatened. It must definitely be clearly serious and, if not occurring immediately, then it must be very imminent.

*Second,* what is meant by an assemblage engaged in a public disturbance? This term, in the context of a riot, connotes an angry or aroused crowd or gathering. The assemblage must number at least five persons, including the defendant. It may of course be larger. In determining whether there was an assemblage you may take into account only what was taking place in the general vicinity where the defendant is claimed to have engaged in the public disturbance. You may consider only the acts, shouts and noise of individuals engaged in tumultuous and violent conduct within the general awareness of the defendant— that is, the activities which on the evidence you find he could reasonably have been expected to see or hear at or about the time he engaged in the public disturbance if in fact you determine he did so engage.

It is not necessary either for the members of the assemblage to have act-

ed pursuant to an agreement or plan either made in advance or made at the time, or for the members to concentrate their conduct on a single piece of property or one or more particular persons. The defendant does not have to personally know or be acquainted with the other members of the assemblage. The other members of the assemblage need not be identified by name or their precise number established by the evidence. You may consider all the facts and circumstances shown by the evidence and determine from the evidence as a whole whether or not there existed an assemblage of five or more persons engaged in a public disturbance involving tumultuous and violent conduct, or the threat thereof, which created grave danger of damage or injury to property or persons.

*Third*, what is meant in law by the requirement that the defendant and the other members of the assemblage must have engaged in such a public disturbance willfully? This means that the defendant and at least four members of the assemblage participated in the public disturbance on purpose, that is that each knowingly and intentionally engaged in tumultuous and violent conduct consciously, voluntarily and not inadvertently or accidentally.

It is sufficient to establish willfulness on the part of the defendant or any other member of an assemblage if you find from all the evidence that by acts, gestures or words he knowingly and intentionally aided or encouraged the tumultuous or violent conduct involving grave danger to property or persons. Willfulness may be inferred. A person is presumed to have knowingly done and intended the natural consequences of his acts. The mere accidental presence of the defendant among persons engaged in such a public disturbance, however, without more does not establish willful conduct or involvement.

